IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

GEORGE ALEXANDER WATSON,     )
Reg. No. 70398-019 ,     )
     )
     Petitioner,     )
     )
     v.     )     CIVIL ACTION NO. 2:18-CV-30-WHA
     )
WALTER WOODS,     )
     )
     Respondent.     )

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

## I.  INTRODUCTION[1]

     This case is before the court on a 28 U.S.C. § 2241 petition for writ of habeas corpus filed by George Alexander Watson.   At the time he filed the instant petition, Watson was incarcerated at the Federal Prison Camp in Montgomery, Alabama, serving a 37-month sentence followed by 3 years of supervised release imposed upon him on November 9, 2016 by the Unites States District Court for the Northern District of Georgia, upon his conviction for wire fraud.   Doc 1 at 1; Doc. 12-1 at 2–4.   In this petition, Watson contends the Bureau of Prisons (BOP) violated his due process and equal protection rights by deeming him ineligible for placement in the Residential Drug Abuse Program (RDAP) and thereby denying him the ability to potentially obtain an early release pursuant to 18 U.S.C. § 3261(e).   For the reasons that follow, this court concludes that Watson is not entitled to

---

[1]All cited documents and attendant page numbers referenced herein are those assigned by this court in the docketing process.

habeas corpus relief.

## II.   RELEVANT FACTS

Watson began serving his sentence in the custody of the BOP on January 9, 2017 and was released from his term of incarceration on August 23, 2019.   Doc. 29-1 at 2.   It is undisputed that Watson participated in the non-residential drug abuse program (NRDAP) while incarcerated in federal custody.   On February 27, 2017, after assessment of relevant documents, a Drug Treatment Specialist (DTS) with the BOP determined Watson was not eligible for participation in the Residential Drug Abuse Program.   Doc. 12-3 at 7.[2] Specifically, the specialist found as follows:

> Inmate WATSON's records [in his] central file do not appear to provide verification establishing a pattern of substance abuse or dependence within the 12 months prior to his arrest for his current instant offense.   Per the PSI and SENTRY documentation, Mr. WATSON was detained in November 2016.   Inmate Watson['s] PSR indicates he first consumed alcohol at the age of 6 and periodically consumed a sip of beer.   He consumed one beer daily from his mid 20s to age 32 and one alcoholic beverage monthly from ages

---

[2]As part of the 1994 Violent Crime Control and Law Enforcement Act, the BOP is charged with "mak[ing] available appropriate substance abuse treatment for each prisoner the Bureau determines has a treatable condition of substance addiction or abuse."   18 U.S.C. § 3621(b).   This treatment program carries with it an early release component, wherein the BOP has discretion to reduce the sentence of an inmate by up to twelve months if the inmate was convicted of a nonviolent offense and successfully completes the RDAP during his term of incarceration within a federal correctional facility.   *See* 18 U.S.C. § 3621(e)(2)(B). Thus, inmates are provided with an incentive to enroll in and complete the RDAP.   However, the BOP has complete discretion in determining which inmates are eligible for placement in its drug treatment programs, including the RDAP.   *See* 18 U.S.C. 3621(b) and 28 C.F.R. § 550.26; *Downey v. Crabtree*, 100 F.3d 662, 670 (9th Cir. 1996) ("Regarding substance-abuse treatment programs, the Bureau's discretion begins with deciding whether an inmate ever enters such a program."); *United States v. Jackson*, 70 F.3d 874, 877 (6th Cir. 1995) ("[I]t is solely within the authority of the Federal Bureau of Prisons . . . to select those prisoners who will be best served by participation in [drug rehabilitation] programs.") (alterations in original).   One of the criteria the BOP utilizes in determining eligibility for such placement is whether the inmate suffered a verifiable substance abuse problem within the 12-month period prior to the arrest for his current offense.

> 32 to 36.   He used marijuana socially at monthly gatherings from ages 16 to 20.   He used cocaine once at age 22.   He used LSD twice when he was age 16.   He used heroin or opiates daily from ages 31 to 33.   He entered Michigan Detox Specialists on August 2, 2012 and discharged on August 5, 2012.   Inmate Watson indicated he has been clean since the rapid detox [in] 2012.
> . . . .
> Based on the observations above, inmate WATSON has not been referred to the DAP Coordinator for a diagnostic interview.

Doc. 12-3 at 7.

Watson initiated the BOP's administrative remedy process by challenging this decision in a request for relief to the warden and seeking a diagnostic interview by the coordinator of the RDAP.   Doc. 12-5 at 2–3.   The warden denied this request.   Doc. 12-5 at 4.   In so doing, the warden informed Watson that:

> A review of your case shows you were reviewed for consideration for RDAP and advised that you did not qualify for an RDAP Diagnostic Interview on February 28, 2017. Current policy (Program Statement 5330.11, Psychology Treatment Programs) states that, in order for an inmate to be referred for a diagnostic interview, the assigned screener will review the inmate's Central File and other collateral sources of documentation to determine if there is verification of a pattern of substance abuse or dependence within the 12-month period prior to the inmate's arrest on his current offense.   A review of your central file showed your arrest date as November 9, 2016.   A review of your Presentence Investigative Report (PSR) showed that you consumed alcohol infrequently ("one beer daily from his mid-20's to age 32 and one alcoholic beverage monthly from ages 32 to 36"), had not consumed marijuana for over 10 years, had not used LSD since age 16, and had "used cocaine once at age 22."   Although your PSR reflected your daily use of opiates "from ages 31 to 33" (roughly 2009 to 2012), it also reflected that you underwent rapid detox treatment from August 2 to August 5, 2012.   On August 5, 2012, you were discharged and "advised to stay on Naltrexone maintenance therapy for one year.   [Watson] indicated he has been clean since the rapid detox."

3

Following your initial disqualification in February 2017, you provided the collateral documentation that you attached to this administrative remedy request — records from Dr. Michael Gordon, MD, referencing the treatment provided in 2012.   That information does not document substance abuse or dependence within the 12 months prior to November 9, 2016. In your request, you referred to having "restarted addition counseling and treatment, which I continued until my self-surrender January 2017."   However, you have not submitted records from that treatment as additional collateral documentation. The information you [have] submitted from Dr. Gordon documents recommendations of "counseling" and "NA" (presumed to be Narcotics Anonymous), but provides no documentation that you underwent the counseling you describe or participated in Narcotics Anonymous.   In your Informal Complaint Resolution, fled May 12, 2017, you stated that your PSR "verifies continued prescribed treatment (Narcotics Anonymous) from '12 to '16."   No such information exists in your PSR. Therefore, of the information you have submitted for review as supplementary documentation for consideration for RDAP, none of it provides evidence to confirm an existing pattern of substance abuse or dependence within the 12 months prior to your arrest for your current offense.

Consequently, you remain unqualified for referral for an RDAP Diagnostic Interview, and were determined unqualified for RDAP in a manner consistent with policy.   You were advised of the treatment alternatives (e.g., the Non-Residential DAP) and the types of supplemental information that may be reviewed for possible further verification of substance abuse or dependence prior to your arrest.   Should such information be received in the future, it will be examined an considered for possible RDAP qualification.

For relief, you requested an RDAP Diagnostic Interview.   Based on the above information, your request for Administrative Remedy is denied.

Doc. 12-5 at 4.

Watson appealed the warden's decision in which he alleged "being unjustly denied participation" in the Residential Drug Abuse Program and "request[ing] a clinical interview with the RDAP Coordinator and eventual admission into RDAP."   Doc. 12-5 at 6.   The

Regional Director denied this appeal because "[a]lthough [your] records do indicate a history of substance abuse, the Substance Abuse section of your PSR indicates no pattern of problematic use within the twelve months prior to your arrest. . . .   Since the information provided by a physician details services rendered years before the 12-month time frame required for program consideration, it fails to meet the criteria regarding acceptable independent verification of a substance use disorder.   You are therefore unqualified for the RDAP in accordance with policy."   Doc. 12-5 at 6.   Watson's final appeal to the Central Office was likewise denied "based on the fact that there is no verifiable documentation to support your participation in RDAP.   As required by policy, you have not provided any documentation to substantiate drug or alcohol abuse within the 12 months prior to being arrested for your current offense."   Doc. 12-5 at 9.

Upon the exhaustion of his available administrative remedies, Watson filed this 28 U.S.C. § 2241 petition for habeas corpus relief.   In this petition, Watson challenges the constitutionality of the BOP's decision to deny him referral to the RDAP coordinator for a diagnostic review based on the finding that he did not have a verifiable substance use disorder within the 12-month period before his arrest on his current offense as required by 28 C.F.R. 550.53(b)(1) and was therefore ineligible for RDAP participation.   Doc. 1 at 6. He further alleges that "[t]he Bureau applies the stated '12-month' rule with bias and discrimination" as some inmates are placed in the RDAP with no drug use for several years prior to their arrest.   Doc. 1 at 6.

### III.   DISCUSSION

### A.  Due Process

Watson argues that the BOP acted improperly by deeming him ineligible for

placement in the RDAP at FPC Montgomery which resulted in his ineligibility for an early

release pursuant to 18 U.S.C. § 3261(e), a benefit potentially available to inmates who

successfully complete the RDAP.  Watson alleges that, in his opinion, the information

provided to BOP officials established a verifiable substance abuse problem within the

requisite 12-month period so as to render him eligible for placement in the RDAP.

The respondent submitted declarations from Juliana Dodd, the Chief Psychologist

at FCP Montgomery, addressing this claim.    In her initial declaration, Ms. Dodd maintains

that:

> The BOP provides both a Residential Drug Abuse Program (RDAP) and a
> non-residential program. BOP Program Statement 5330.11, Psychology
> Treatment Programs (dated March 16, 2009} (formerly Program Statement
> 5330.01, Drug Abuse Program Manual), establishes the procedures and
> requirements for these programs. Bureau policy provides there are more
> stringent requirements to qualify for RDAP. Upon completion of RDAP the
> inmate may be eligible for getting up to a year off his/her sentence.
>
> RDAP is a voluntary program. Inmates are informed in Admission and
> Orientation (A&O) that they may request RDAP review by submitting an
> Inmate Request to Staff form (more commonly known as a "cop-out") to
> Psychology staff. Once a cop-out is received, the first step is for the inmate
> to be screened. The screening is essentially a document review. This means
> we will review the inmate's central file and other collateral sources of
> documentation to determine if, among other things, there is verification that
> can establish a pattern of substance abuse or dependence.   Only if the inmate
> has independently verifiable documentation of a substance abuse problem,
> will the inmate move on to the second phase, the clinical diagnostic

interview.

Policy lists additional independent verification sources as, "probation officer, parole officer, social service profession, etc." or a "medical provider." Although documentation is often received by sources outside of this parameter, [such documentation] is largely dismissed as "independent verification." Documentation from parents, friends, religious leaders, defense attorneys or other sources that may have a vested interest in the inmate's case, would not qualify as independent documentation of a substance abuse problem.

The   Program Statement notes that:   "Recreational, social or occasional use of alcohol and/or other drugs that does not rise to the level of excessive or abusive drinking does not provide the required verification of a substance use disorder.   Any verifying documentation of alcohol or other drug use must indicate the problematic use; i.e. consistent with the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Health Disorders (DSM) criteria."

In the event there is no verifying documentation in the inmate's materials, the Drug Treatment Specialist who has reviewed the documentation will meet with the inmate and inform him of such. The inmate is offered several options, including: volunteering for the Non-Residential Drug Abuse Program, seeking documentation from a substance abuse treatment provider where he previously sought treatment, signing a consent form to have any physical proof of substance abuse submitted by medical staff, etc.

Inmate Watson's PSR indicates he first consumed alcohol at the age of 6 and periodically consumed a sip of beer. He consumed one beer daily from his mid-20s to age 32 and one alcoholic beverage monthly from ages 32 to 36. He used marijuana socially at monthly gathering[s] from ages 16 to 20. He used cocaine once at age 22. He used LSD twice when he was age 16. Inmate Watson used heroin or opiates daily from ages 31 to 33. He entered Michigan Detox Specialists in August 2012, and was discharged on August 5, 2012. He indicated he has been clean since the rapid detox in 2012.

Following screening of his records, inmate Watson did not have or provide independently verifiable documentation of a substance abuse problem within the required time period (12 months prior to arrest on the current offense) and therefore did not move to the second phase of consideration, the clinical

diagnostic interview.

The clinical diagnostic interview is a one- to two-hour process in which an experienced psychologist applies the Diagnostic and Statistical Manual of Mental Disorders (DSM), currently the Fifth Edition (DSM-5), in determining whether the inmate has a diagnosable and verifiable substance use disorder.

According to the American Psychiatric Association (APA), "the DSM is the handbook used by health care professionals in the United States and much of the world as the authoritative guide to the diagnosis of mental disorders. The DSM contains descriptions, symptoms, and other criteria for diagnosing mental disorders, and it provides a common language for clinicians to communicate about their patients, and establishes consistent and reliable diagnoses that can be used in the research of mental disorders. It also provides a common language for researchers to study the criteria for potential future revisions and to aid in the development of medications and other interventions."

Keeping with the private and community standards for the professions of psychiatry and psychology, the Bureau utilizes the DSM-5 when determining which inmates receive a substance use disorder diagnosis required for admission into RDAP.  Only those inmates whose use patterns, within the 12 months prior to the arrest for the instant offense, satisfy the DSM diagnostic criteria for Substance Abuse or Dependence shall be considered for RDAP, notwithstanding other admissions criteria having been satisfied as well (e.g., sufficient time left on sentence, absence of precluding cognitive or language barriers, ability to complete all three components to include community-based follow up treatment services in an approved Residential Re-entry Center (RRC)).

The Bureau recognizes numerous inmates may not qualify for RDAP for many reasons, to include insufficient documentation to verify self-reported claims of substance abuse or dependency, and the agency therefore intentionally and ethically provides alternative drug treatment in the form of the high-quality Non-Residential Drug Abuse Program, available at all Bureau facilities.

Following inmate Watson's initial disqualification for RDAP, he submitted additional documentation to attempt to meet the 12 month requirement.

However, review of this documentation by the Drug Abuse Programs Coordinator determined that none of the submitted documentation provided evidence to confirm an existing pattern of substance abuse or dependence within the 12 months prior to his arrest for his current offense.

Inmate Watson submitted records from a Dr. Michael Gordon, referencing treatment provided in 2012, but that is more than 12 months prior to November 9, 2016. He referred to having "restarted additional counseling and treatment" which he reportedly continued until his self-surrender in January 2017, yet did not submit records from that treatment as additional collateral documentation. He claimed that his PSR "verifies" continued prescribed treatment (Narcotics Anonymous) from 2012 to 2016. No such information exists in his PSR.

Title 18, United States Code, § 3621(b). the last sentence states, "The Bureau shall make available appropriate substance abuse treatment for each prisoner the Bureau determines has a treatable condition of substance addiction or abuse." Consequently, the BOP has the discretion to assess an inmate's substance use patterns and then determine what services would best address his or her treatment needs.

Thus, it is clear inmate Watson has been appropriately screened and assessed for the RDAP. He was denied qualification for RDAP, but he was not denied access to substance abuse treatment. The sum of the available data indicates the non-residential program is appropriate drug treatment for this inmate. Records reflect that inmate Watson completed the Non-Residential Drug Abuse Program on September 26, 2017. Thus, he took advantage of the most intensive substance abuse treatment available to him based on his documented treatment needs.

Doc. 12-3 at 2–5 (paragraph numbering and reference to attachment omitted).

In a second declaration, Ms. Dodd further avers that:

Inmate Watson states that he "has been in an artificial [and] controlled environment since August 2012" due to his cooperation with the government. Diagnostically, a "controlled environment" is one in which access to addictive substances is restricted. Although inmate Watson perceived his status to be changed by virtue of cooperating with the government, he continued to have access to, but not use of, addictive substances within the

12 months prior to his arrest. In his claim of being in a "controlled environment since August 2012," it appears Inmate Watson is attempting to push back the anchor point for the 12-month symptom consideration period because the information he submitted for eligibility is from 2012. However, there is no evidence, inmate Watson was in a "controlled environment," regardless of his perception.

On February 28, 2017, when inmate Watson was informed he had not presented adequate substantiating documentation of a pattern of problematic substance use, he was provided a document which listed options for him. According to the document, pulled straight from BOP policy, if inmate Watson did not want to only take part in the non-residential program, which has no associated early release eligibility, he needed to submit documentation to corroborate the presence of problematic substance use within the 12 months prior to his arrest. To do such, he could have submitted documentation from a substance abuse treatment provider where he previously received treatment. That document must have been written at the time services were provided and must demonstrate that substance use diagnosis was completed at the time he was seen. The documentation should be received directly to the institution, not by the inmate and delivered by the inmate.

Inmate Watson could also have provided documentation from a probation officer, parole officer, a social services professional, who has information which would verify inmate Watson's problem with illegal or illicit substances. Again this information must be received directly [by] the institution, not by the inmate and [then] delivered by the inmate.

Inmate Watson could have also showed physical proof of his substance use that was examined by medical staff to prove addiction.

To date, none of this has been provided for or by inmate Watson.

Inmate Watson also states his participation in bi-weekly NA/AA meetings from 2012 until his presentence interview in August of 2016 qualifies him. One of the cardinal values of Narcotics Anonymous (NA) and Alcoholics Anonymous (AA) is anonymity. As a result, these organizations do not provide documentation to corroborate their participants' presence. Consequently, the BOP does not rely on this as a valid source for corroborating one's ongoing use of addictive substances.

Inmate Watson also cites his "continued treatment" for opiate dependence until January 2017 as qualifying. This goes against information directly presented in his presentence report ( PSR ) . Inmate Watson's PSR reflected that he used opiates daily from about 2009 to 2012, but then underwent rapid detox treatment from August 2 to August 5, 2012. When he was discharged he was advised to stay on maintenance therapy for one year.  In the PSR, inmate Watson indicated he had been clean since the rapid detox.

As stated in my original declaration, following inmate Watson's initial disqualification, he submitted additional documentation to attempt to provide evidence of problematic substance use within the required 12-month period for symptom review. However, Psychology staff determined that none of the submitted documentation provided evidence to confirm an existing pattern of substance abuse or dependence within the 12 months prior to his arrest for his current offense. To date this remains true.

In conclusion, inmate Watson has been appropriately screened and assessed for the RDAP. He was determined disqualified for RDAP, but he has not been denied treatment for his substance addiction. The sum of the available data indicates the non-residential program is appropriate drug treatment for this inmate and he has been strongly encouraged to pursue it at his current institution.

Doc. 23-1 at 2–4 (references to attachments omitted).

The law is well-settled that the

"BOP possesses substantial discretion in determining who is eligible for early release upon completion of the drug treatment program and how early the release should be." *United States v. Lopez–Salas*, 266 F.3d 842, 847 (8th Cir. 2001) (citing *Lopez v. Davis*, 531 U.S. 230, 121 S.Ct. 714, 148 L.Ed.2d 635 (2001)). But contrary to defendant's suggestions, "[p]risoner classification and eligibility for rehabilitation programs in federal prisons are not directly subject to 'due process' protections." *Bulger v. U.S. Bureau of Prisons*, 65 F.3d 48, 49 (5th Cir. 1995) (citing *Moody v. Daggett*, 429 U.S. 78, 88 n. 9, 97 S.Ct. 274, 50 L.Ed.2d 236 (1976)). Rather, a prisoner "does not have a liberty interest in participating in the residential drug abuse treatment program and receiving a reduction of his sentence upon successful completion of the program because the Bureau of Prisons has [unfettered]

> discretionary authority to decide who participates in the program and of those participants, who is eligible for a sentence reduction" pursuant to 18 U.S.C. § 3621(e)(2)(B) (providing for reduction in sentence upon successful completion of RDAP). *Pacheco v. Lappin*, No. 05–C–141–C, 2005 WL 752269, at *4 (W.D. Wis. Mar.30, 2005); *see also Cook v. Wiley*, 208 F.3d 1314, 1322–23 (11th Cir. 2000) (holding § 3621(e)(2)(B) does not create a constitutionally protected liberty interest in early release); *Venegas v. Henman*, 126 F.3d 760, 765 (5th Cir. 1997) ("The loss of the mere opportunity to be considered for discretionary early release is too speculative to constituted deprivation of a constitutionally protected liberty interest.").

*United States v. Mikhael*, 2012 WL 4093781, at *1 (N.D. Fla. Aug. 16, 2012), Report and Recommendation adopted, 2012 WL 4093765 (N.D. Fla. Sept. 18, 2012); *see Laws v. Barron*, 348 F.Supp.2d 795, 806 (E.D. Ky. 2004), citing 18 U.S.C. § 3621(b) and 28 C.F.R. § 550.26, (acknowledging that the BOP's imposition of the requirement that an inmate establish he suffered a substance abuse problem during the 12 month period prior to arrest for his current offense "is a reasonable exercise of the BOP's statutory discretion to determine who among the prison population has 'a substance abuse problem' and to choose 'appropriate' treatment for each prisoner who claims to need treatment."). In *Laws*, the court also found no liberty interest in participation in the RDAP which would trigger the protections of due process. *Id*. Thus, the wide discretion of the BOP in determining eligibility for the RDAP — and likewise eligibility for early release pursuant to 18 U.S.C. § 3261(e) — is clearly established. *Lopez*, 531 U.S. at 233–36.

Congress did not set forth specific criteria that the BOP must apply in determining which inmates are eligible for a drug treatment program. An "eligible" prisoner is one who is "determined by the Bureau of Prisons to have a substance abuse problem," and who

is "willing to participate in a residential substance abuse treatment program."   18 U.S.C. § 3621(e)(5)(B)(i) and (ii).   As previously stated, as an incentive for successful completion of the residential treatment program, the period of time a prisoner convicted of a nonviolent offense remains in custody after successfully completing such a treatment program may be reduced up to one year by the BOP.  *See* 18 U.S.C. § 1361(e)(2).

The BOP has promulgated regulations to implement these statutory requirements. The pertinent regulation in this case is codified at 28 C.F.R. § 550.53.   With respect to this regulation, BOP Program Statement 5330.11 states that, when an inmate is either referred to the RDAP or applies for the program, "[u]pon completion of the Psychology Intake Screening, the psychologist will refer inmates with a substance use history and an interest in treatment to the institution's DAPC." Federal Bureau of Prisons, Program Statement 5330.11, Psychology Treatment Programs, § 2.5.8.   With respect to the screening process, the Program Statement states, in relevant part, that "the DTS will review an inmate's Central File and other collateral sources of documentation to determine" eligibility.   *Id.*   The Program Statement further clarifies that a Clinical Interview will only be conducted where verifying documentation of substance abuse for the 12-month period prior to the inmate's arrest for his current offense is found or produced.   *Id*. at § 2.5.9 ("If verifying documentation is found or produced, and only then, inmates who volunteer for the RDAP will be personally interviewed by the DAPC.").

Here, various BOP officials reviewed Watson's file to determine whether he met

13

the eligibility requirements for placement in the RDAP.   They determined that Watson did

not have a verifiable substance abuse problem within the 12-month period prior to arrest

for his current offense.   With regard to the collateral documents and statements submitted

by Watson, including records from Dr. Michael Gordon and statements made by Watson

regarding his continued participation in NA, the BOP officials concluded that these

documents and statements were of limited evidentiary value and did not "provide[]

evidence to confirm an existing pattern of substance or dependence within the 12 months

prior to [Watson's] arrest for [his] current offense."   Doc. 12-5 at 4; Doc. 12-5 at 6; Doc.

12-5 at 9.

Upon review of the record in his case, the court finds that the BOP was well within

its discretion in evaluating Watson's RDAP eligibility and determining he did not qualify

for placement in the RDAP upon determining that he had failed to show he suffered a

verifiable substance abuse problem within the 12 months prior to his arrest for the current

offense.   Watson has failed to show that the BOP applied the controlling statute, its

regulations, or its program statements to him in an arbitrary manner or that the BOP

otherwise abused its discretion in deeming him ineligible for placement in the RDAP.   The

law is clear in this circuit that inmates have absolutely no constitutional right to, or other

protected liberty interest in, participation in the RDAP, or to a sentence reduction upon

successful completion of the RDAP.   *Cook v. Wiley*, 208 F.3d 1314, 1322–23 (11th Cir.

2000).   Where there is no protected liberty interest at stake, the procedures the BOP

follows in making decisions are not required to comport with due process standards. *See O'Kelley v. Snow*, 53 F.3d 319, 321 (11th Cir. 1995). With no liberty interest at stake, Watson lacks a valid claim that he was entitled to placement in the RDAP and thus fails to show that his right to due process was violated by the decision denying his referral for the program. Moreover, if the court undertook a review of the individualized eligibility determination made regarding Watson, it would require disregarding the express language of 18 U.S.C. § 3625, and would impose a level of judicial oversight on the BOP's drug treatment programs not contemplated by the statute. It would also put this court in the untenable position of micro-managing the BOP's individualized determinations inherent to the management of its drug treatment programs and ignoring the "wide-ranging deference to be accorded to the decisions of prison administrators." *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 125–26 (1977).

## B.   Equal Protection

Watson also maintains that his removal from the RDAP violated his right to equal protection as he alleges the BOP "applied the 12-month rule unequally" as some inmates "in substance abuse remission are admitted into the program on a regular basis." Doc. 1 at 6. Watson does not identify any inmate who did not meet the 12-month rule that the BOP admitted into the RDAP. Other than his conclusory allegation of unequal treatment of inmates, Watson sets forth no facts to support his allegation of an equal protection violation. Instead, he relies on a purely conclusory legal assertion that his denial of

15

placement in the RDAP deprived him of equal protection.   Merely labeling an action

violative of equal protection fails to state a claim on which relief may be granted.   *See Bell*

*Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

"Despite the tendency of all rights 'to declare themselves absolute to their logical

extreme,' there are obviously limits beyond which the equal protection analysis may not

bepressed. . . .   The Fourteenth Amendment 'does not require absolute equality or

precisely equal advantages,'. . . nor does it require the State to 'equalize [prison]

conditions.'"   *Ross v. Moffitt*, 417 U.S. 600, 611-612 (1974); *Hammond v. Auburn*

*University*, 669 F.Supp. 1555, 1563 (M.D.Ala. 1987) ("The Equal Protection Clause of the

Fourteenth Amendment does not require all persons to be treated either identically or

equally.").   In order to present a claim of discrimination cognizable under the Equal

Protection Clause, "a prisoner must [at a minimum] demonstrate that (1) he is similarly

situated to other prisoners who received more favorable treatment; and (2) the

[government] engaged in invidious discrimination against him based on race, religion,

national origin, or some other constitutionally protected basis.   *Jones v. Ray*, 279 F.3d 944,

946–47 (11th Cir. 2001); *Damiano v. Florida Parole and Prob. Comm'n*, 785 F.2d 929,

932-33 (11th Cir. 1986)."   *Sweet v. Secretary, Department of Corrections*, 467 F.3d 1311,

1318-19 (11th Cir. 2006).   "[O]fficial action will not be held unconstitutional solely

because it results in a . . . disproportionate impact. . . .   Proof of . . . discriminatory intent

or purpose is required to show a violation of the Equal Protection Clause."   *Village of*

16

*Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 264–65 (1977).  "'Discriminatory purpose' . . . implies more than intent as volition or intent as awareness of consequences.  It implies that the decision maker . . . selected . . . a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group."  *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979) (footnote and citation omitted); *see also Hernandez v. New York*, 500 U.S. 352, 359 (1991).  Evidence which merely indicates disparity of treatment or even arbitrary administration of state powers, rather than instances of purposeful or invidious discrimination, is insufficient to show discriminatory intent.  *McKleskey v. Kemp*, 481 U.S. 279, 292 (1987).

Watson fails to identify any similarly situated inmate who received differential favorable treatment from the BOP.  Thus, Watson's equal protection first fails because he has not presented any evidence that he was treated differently from another inmate actually similarly situated to him, i.e., an inmate with no verifiable evidence of drug abuse within the 12-month period prior to arrest for his current offense who received placement in the RDAP.  *Sweet*, 467 F.3d at 1319.  This claim likewise provides no basis for relief

> because [Watson] has not alleged . . . that he was treated differently on account of some form of ***invidious discrimination*** tied to a constitutionally protected interest.  He has not even claimed that he was treated differently from others because of race, religion, or national origin.  *See Snowden v. Hughes*, 321 U.S. 1, 8, 64 S.Ct. 397, 88 L.Ed. 497 (1944) ("The unlawful administration . . . of a state statute fair on its face, resulting in its unequal application to those who are entitled to be treated alike, is not a denial of equal protection unless there is shown to be present in it an element

of intentional or purposeful discrimination."); *McQueary v. Blodgett*, 924 F.2d 829, 835 (9th Cir.1991) (rejecting a claim that a state prisoner's equal protection rights were violated because he received a longer sentence than some other prisoners and holding that "a mere demonstration of inequality is not enough; the Constitution does not require ***identical*** treatment.  There must be an allegation of invidiousness or illegitimacy in the statutory scheme before a cognizable claim arises:  it is a settled rule that the Fourteenth Amendment guarantees equal laws, not equal results."  (internal quotation marks omitted)); *see also Cruz v. Skelton*, 543 F.2d 86, 92–93 (5th Cir.1976) (affirming dismissal of prisoner's equal protection claim because there was no allegation of "'invidious discrimination' based on such considerations as race, religion, national origin, or poverty").

*Sweet*, 467 F.3d at 1319 (emphasis in original).

Watson fails to meet his pleading burden, as he does not contend that the BOP subjected him to adverse treatment based on some constitutionally impermissible reason, nor does he identify any other similarly situated inmate who received more favorable treatment from the BOP.  *See Jones*, 279 F.3d at 946–47.  Consequently, Watson is not entitled to any relief based on his allegation of an equal protection violation.

## C.   Mootness

To obtain relief in this habeas action, Watson must demonstrate that he "is [currently] in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). In addition, under Article III, § 2 of the United States Constitution, federal courts are barred from hearing matters, including habeas petitions, in the absence of a live case or controversy.  *See, e.g., Spencer v. Kemna,* 523 U.S. 1, 7 (1998); *Deakins v. Monaghan,* 484 U.S. 193, 199 (1988).   For a live case or controversy to exist, at all times in the litigation, the petitioner "must have suffered, or be threatened

with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." *Lewis v. Continental Bank,* 494 U.S. 472, 477 (1990); *see also North Carolina v. Rice,* 404 U.S. 244, 246 (1971) (*per curiam* ) (holding that "federal courts are without power to decide questions that cannot affect the rights of litigants in the case before them").

"[A] case is moot when it no longer presents a live controversy with respect to which the court can give meaningful relief." *Soliman v. U.S. ex rel. INS*, 296 F.3d 1237, 1242 (11th Cir. 2002). "When effective relief cannot be granted because of later events, the [case] must be dismissed as moot." *Westmoreland v. National Transportation Safety Board,* 833 F.2d 1461, 1462 (11th Cir. 1987); *American Rivers v. Nat'l Marine Fisheries Service,* 126 F.3d 1118, 1123 (9th Cir. 1997) ("If an event occurs that prevents the court from granting effective relief, the claim is moot and must be dismissed."). "It has long been settled that a federal court has no authority to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it." *Church of Scientology of California v. United States,* 506 U.S. 9, 12 (1992) (internal quotation marks and citation omitted); *Preiser v. Newkirk,* 422 U.S. 395, 401 (1975) (a federal court no longer has jurisdiction over a case that has become moot). In the specific context of habeas petitions, the case or controversy requirement warrants a finding of mootness if: (1) the petitioner has received the relief requested in the petition; or (2) the court is unable to provide the petitioner with the relief

sought.  *See Munoz v. Rowland,* 104 F.3d 1096, 1097–98 (9th Cir.1997).

Watson's objective in filing this habeas petition was to obtain eligibility for referral to the RDAP Coordinator for a diagnostic interview in order to obtain placement in the RDAP and, if he successfully completed the program, the possibility of being granted a reduction of his sentence.  Any relief sought by Watson with respect to a sentence reduction is premised on his successful completion of the RDAP.  However, Watson has fully completed his term of incarceration and is not now incarcerated in a federal facility.  Consequently, he cannot take part in the RDAP and, as such, the court cannot now give him meaningful habeas relief on this claim.  Therefore, his request for habeas relief is moot and this petition is likewise due to be dismissed for mootness.

## IV.   CONCLUSION

Accordingly, it is the RECOMMENDATION of the undersigned Magistrate Judge that:

1.   The 28 U.S.C. § 2241 petition for habeas corpus relief filed by George Alexander Watson be DENIED.

2.   This case be dismissed with prejudice.

On or before **October 1, 2019** the parties may file objections to the Recommendation.  A party must specifically identify the factual findings and legal conclusions in the Recommendation to which the objection is made.  Frivolous, conclusive, or general objections to the Recommendation will not be considered.  Failure

to file written objections to the Magistrate Judge's findings and recommendations in accordance with the provisions of 28 U.S.C. § 636(b)(1) shall bar a party from a de novo determination by the District Court of legal and factual issues covered in the Recommendation and waives the right of the party to challenge on appeal the District Court's order based on unobjected-to factual and legal conclusions accepted or adopted by the District Court except upon grounds of plain error or manifest injustice.   11TH Cir. R. 3-1; *see Resolution Trust Co. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989).

     DONE this 17th day of September, 2019.


                     /s/   Charles S. Coody
                    UNITED STATES MAGISTRATE JUDGE